**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| DRIVER OPPORTUNITY PARTNERS I,<br>LP., a Delaware Limited Partnership<br>250 Park Avenue, 7th Floor<br>New York, NY 10177<br><br>       Plaintiff,<br><br>   v.<br><br>FIRST UNITED CORPORATION, a<br>Maryland corporation<br>   <u>Serve on</u>:<br>       William B. Grant, registered agent<br>       19 S. Second Street<br>       Oakland, MD 21550<br><br>   and<br><br>JOHN F. BARR, an individual<br>12404 Rocky Fountain Lane<br>Clear Spring, MD 21722-1763<br><br>   and<br><br>BRIAN R. BOAL, an individual<br>317 E Oak Street, # 1<br>Oakland, MD 21550<br><br>   and<br><br>M. KATHRYN BURKEY, an individual<br>120 S. Liberty Street<br>Cumberland, MD 21502<br><br>   and<br><br>ROBERT W. KURTZ, an individual<br>139 N. Second Street<br>Oakland, MD 21550<br><br>   and<br><br>JOHN W. McCULLOUGH, an individual | CASE NO. <u>1:20-cv-2575</u><br><br><br><br>**COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

255 Tomar Drive
Oakland, MD 21550

    and

ELAINE L. McDONALD, an individual
672 White Oak Drive
Swanton, MD 21561

    and

PATRICIA MILON, an individual
1406 Ingeborg Court
McLean, VA 22101

    and

CARISSA L. RODEHEAVER, an individual
1546 Orendorf Road
Accident, MD 21520

    and

GARY R. RUDDELL, an individual
One Corporate Drive
Grantsville, MD 21536

    and

I. ROBERT RUDY, an individual
115 S. Second Street
Oakland, MD 21550

    and

MARISA A. SHOCKLEY, an individual
3018 Old Annapolis Trail
Frederick, MD 21701

    and

H. ANDREW WALLS, III, an individual
915 Green Bag Road
Morgantown, WV 26508

          Defendants.

## COMPLAINT FOR DAMAGES
## AND INJUNCTIVE RELIEF

**NOW COMES** Plaintiff Driver Opportunity Partners I, LP ("Driver" or the "Fund") as and for its complaint against First United Corporation (the "Company," "First United," or "FUNC") and the individual members of the First United Board of Directors Messrs./Mses. Barr, Boal, Burkey, McCullough, McDonald, Milon, Rodeheaver, Ruddell, Rudy, Shockley, and Walls (the "Individual Defendants" or "Directors"; together the "Board") avers as follows[1].

## NATURE OF THE ACTION

Driver is a minority shareholder in the publicly traded stock of FUNC, a Maryland bank holding company.  In 2019, Driver raised concerns about the First United's prospects as a standalone enterprise and whether shareholders would be better served by a sale to a larger banking organization, as well as the separate interests of the directors that might prevent them from taking actions that would increase the value of all shareholders' investment in FUNC.  If taken seriously by shareholders, these concerns threatened to disrupt the cozy relationship between the bank[2] and the entrenched members of its Board.  When Driver refused to go away quietly after the bank ignored its requests, the Directors embarked on a secret campaign to disenfranchise Driver for the primary purpose of preventing a contested election of directors at the 2020 Annual Meeting—

---

[1] Mr. Kurtz retired from the Board on June 17, 2020—six days following the annual meeting—after serving on the Board for approximately 30 years.  Ms. Milon did not stand for election at the June 11 meeting, but was appointed to the Board as of June 17, 2020..  Ms. McDonald retired from the Board on July 22, 2020 after serving on the Board for approximately 26 years.  As used in the Complaint, "Board" refers to the directors (collectively) serving as of the time of the actions complained of.

[2] The bank is actually an asset of FUNC rather than FUNC itself (which is a holding company), but as the distinction is irrelevant here, Plaintiff at times refers to FUNC as "the bank" to reflect the nature of its business, or as "the company" to distinguish it from the Directors themselves.

thereby depriving all shareholders of the right to elect directors of their choosing—through every means at their disposal, lawful and otherwise. The Board's motive and objective were clear: eliminate the ability of shareholders to vote for any director candidate other than incumbent directors.

The Directors acted in their own names and also caused or endorsed action in the name of the corporation they control, squandering corporate resources for the primary purpose of stripping the voting rights of a "troublesome" shareholder—not just to silence the criticism but also, and more importantly, to prevent that shareholder from nominating candidates for director. Their plan from inception was to deprive all First United shareholders of their fundamental right to choose directors, thereby tainting the election of directors at the Company's 2020 annual meeting. Put bluntly, the Directors' intention was to ensure that there were no challenges to the election of Incumbent Director nominees at the 2020 Annual Meeting, thus guaranteeing the outcome of the election. The Company repeatedly lied to investors about the election, the voting process, and the merits of the concerns raised by Driver, all while abusing the regulatory process with its primary regulator and then lying to shareholders about it directly and in SEC filings subject to federal securities laws prohibiting false and misleading statements.

By this action, Driver seeks damages for multiple breaches of the Directors' fiduciary duties owed to Driver and all shareholders, their contempt for the shareholder franchise, flagrant disregard of the Company's responsibility to be truthful in public reporting and the Company's multiple abuses of process, defamation, tortious interference, unfair competition, and unjust enrichment. The multiple false and materially misleading statements and omissions in the Company's SEC filings also violate applicable federal securities laws. In addition to damages, Driver seeks an order invalidating the results of the tainted election of directors at the 2020 Annual

4

Meeting and directing First United to hold a special meeting of shareholders in order to elect directors to fill the resulting vacancies.

## PARTIES

1.      Plaintiff Driver Opportunity Partners I, LP is a Delaware limited liability company formed in April 2019 as an investment fund.  Since August 2019, Driver has been beneficial owner of just under 5.1% of the outstanding shares of FUNC common stock.[3]  Upon information and belief, Driver is one of the largest holders of FUNC common stock.

2.      Defendant FUNC is the publicly-traded parent of Maryland-chartered First United Bank & Trust, a depository institution based in Garrett County, Maryland.  First United Bank & Trust primarily operates in the markets of western Maryland and the surrounding regions of West Virginia.  As a bank holding company, FUNC is subject to regulatory oversight by the Maryland Commissioner of Financial Regulation (the "Maryland Commissioner"), its primary state regulator.

3.      Defendants John F. Barr; Brian R. Boal; M. Kathryn Burkey; Robert W. Kurtz; John W. McCullough; Elaine L. McDonald; Carissa L. Rodeheaver; Gary R. Ruddell; I. Robert Rudy; Marisa A. Shockley; and H. Andrew Walls, III (the "Incumbent Directors") served as members of FUNC's board of directors during the period leading up to the June 11, 2020 FUNC annual meeting of shareholders.  Subsequent to the annual meeting, Mr. Kurtz and Ms. McDonald resigned from the board, and Ms. Milon was appointed (the Incumbent Directors without Kurtz and McDonald, plus Milon, collectively, the "Current Directors").  Upon information and belief,

---

[3]      The general partner of Driver is a Delaware limited liability company with a name that also begins with "Driver," and for which non-party J. Abbott Cooper is managing member.  When describing activities in March 2019 prior to formation of the fund, "Driver" thus refers to the activities of the general partner.  Driver also has at times been referenced (mostly by First United representatives) with the pronoun "he," referring to Mr. Cooper.

all named individual defendants except Milon and Walls are residents of Maryland.   Upon information and belief, Milon is a resident of Virginia and Walls is a resident of West Virginia.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.      This Court has jurisdiction over each named Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District.  The transactions and wrongful acts that give rise to this complaint occurred in this District.

## FACTUAL BACKGROUND

**I.      First United Is An Underperforming Stock Managed By A Board of Directors With Entrenched Interests.**

7.      Driver invests in those publicly traded bank holding companies that it believes need an external catalyst to unlock shareholder value due to the conflicted interests of a board of directors.  Specifically, Driver invests in publicly traded bank holding companies where it believes that sale value far surpasses standalone value and the primary impediment to a sale that would significantly increase the value of all shareholders' investment is a board of directors with interests that are not aligned with shareholders.

8.      First United has a long record of underperformance relative to bank and general indices.  FUNC's common stock began trading on Nasdaq on September 2, 1992.  Since that time,

FUNC's stock price has underperformed the S.N.L. U.S. Bank Index (the "SNL Bank Index"), an index of all banks or bank holding companies that trade on a major U.S. exchange, by more than eighteen (18) times (more than 1800%) and has underperformed the Russell 2000 Index by more than forty-six (46) times (more than 4600%).[4]  From December 31, 2019 to September 4, 2020, FUNC's stock price has declined by more than 54%, compared to declines of 33% for the SNL Bank Index and 7% for the Russell 2000 Index.

9.      In addition, FUNC has a history of mismanagement that has led to massive destruction of shareholder value.  For instance, a majority of FUNC's board of directors approved a strategy in 2007 designed to boost earnings.  At the time of Driver's initial investment in March 2019, the results of that strategy were losses of more than $20 million of shareholders' equity relative to 2009 and 2010.

10.     Prior to embarking on the failed 2007 strategy, which FUNC later admitted was reckless and ill-advised, tangible book value per share (a recognized measure of value creation for banking organizations) was $14.68 on December 31, 2007.  Tangible book value per share then declined to $9.36 as of December 31, 2008, $9.17 as of December 31, 2009 and $8.46 as of December 31, 2010.  Tangible book value per share at year-end did not exceed the 2007 value of $14.68 per share until 2018, ending a lost decade for FUNC shareholders.

## II.    Driver Invests In First United Corporation And Asks Management To Explore A Potential Sale To Improve Shareholder Value.

11.     Based on extensive analysis and research, including analysis of First United's historical financial and operational performance, filings with the Securities and Exchange Commission (the "SEC") and regulatory data as well as discussions with other market participants

---

[4] As of September 1, 2020.

(such as other investors, research analysts, investment bankers and banking executives), Driver determined in early 2019 that FUNC's stock price was trading at a substantial discount to the price that Driver believed might be obtained in a sale.

12.     In addition, based on Driver's analysis of the current and historical share ownership of First United's directors and management, the tenure of First United's directors, the amount First United's directors were paid for service on the Board relative to their ownership of First United common stock and other subjective factors, Driver determined that First United's directors' interests were not aligned with shareholders' interests generally, and that the principal impediment to a sale to increase the value of all shareholders' investment in FUNC was a board more interested in protecting their own interests than increasing shareholder value.

13.     Driver first communicated its view that First United was likely worth far more in a sale than as a standalone business by letter dated March 15, 2019 to Defendant Rodeheaver, Chairman and CEO of First United.  Driver requested that First United retain a qualified investment bank to solicit acquisition proposals from other banks for the purpose of testing the market.  Driver also wanted to discuss First United's financial and operating performance with Ms. Rodeheaver.

14.     On March 26, 2019, Driver first publicly expressed its views regarding First United by filing exempt solicitation materials with the SEC, which (i) stated Driver's belief that First United would be worth more in a sale than independent, (ii) expressed concern regarding First United's corporate governance and lack of alignment with shareholder interests, (iii) requested that First United retain financial advisors and explore a sale, and (iv) stated Driver's intention to vote against First United's nominees for director and against approving the compensation paid to First United's executive officers in 2018 at the Company's 2019 annual meeting of stockholders.

15.     On March 28, 2019, Driver filed exempt solicitation materials with the SEC, comparing First United's total shareholder return for the period March 23, 2016 to March 26, 2019—which was negative 2.11%—to selected indices and publicly-traded banks.  Driver also examined the compensation from First United to the Individual Defendant directors who had served continuously on the Board since before 2006.

16.     Driver continued to communicate publicly and with Company management throughout the summer of 2019, reiterating its view that engaging an investment bank to evaluate a potential sale was more likely to improve shareholder value than continuing with the failed policies historically embraced by the entrenched board.  One example of Driver's analysis is included here as Exhibit C, an August 20, 2019 presentation prepared for the Board that included Driver's analysis—indicating that FUNC could be worth from $25.69 to $32.93 per share in a sale. As of August 20, 2019, First United's stock price was $21.01 per share.

17.     First United consistently ignored or rebuffed Driver's inquiries, typically but not exclusively through Defendant Rodeheaver.

18.     On August 28, 2019, Driver purchased additional shares in FUNC, which increased Driver's stake in the corporation from 4.970% to 5.005%.  By comparison, based on information contained in FUNC's 2019 Proxy Statement, First United's directors and officers as a group collectively owned shares representing only 4.3% of First United's outstanding common stock. Because its beneficial ownership thus exceeded 5% of a public company's stock, Driver filed a Schedule 13D with the SEC the following week, as required by federal law.  17 C.F.R. § 240.13d–19(a).  At today's trading price, the market value of Driver's ownership interest is approximately $4 million.

19.     The Schedule 13D publicly reported acquisition of the interest and its purpose, in full recognition of federal prohibitions against false or misleading statements.  As reported in its Schedule 13D, Driver purchased shares in First United based on its belief that the shares, when purchased, were trading at a significant discount to fair value and that the then-current market price for First United's common stock did not fully reflect the value that might be obtained for the shares in a sale of First United to a larger banking organization.  In addition, in response to the instructions for "Item 4. Purpose of Transaction" of Schedule 13D, Driver specifically disclaimed any present plan or proposal to directly cause the sale of the company or change the board of directors or management, among the matters set forth in subparagraphs (a)–(j) therein.

20.     The Incumbent Directors interpreted Driver's public call for action to increase shareholder value and scrutiny of their failings as a direct threat to their interests and the cozy relationship they had enjoyed for decades.  That same day, September 5, 2019, First United filed a Form 8-K claiming, *inter alia*, that Driver had "announced its intention to launch a distracting and costly public campaign."  FUNC stock closed that day trading at $22.10 per share.

21.     Driver had done no such thing.  On September 6, 2019, Driver filed an amendment to the Schedule 13D eliminating any confusion caused by First United's inaccurate allegation that Driver had "announced its intention to launch" any type of "campaign," rather than what Driver had actually done—invite First United to constructively engage with shareholders regarding their legitimate concerns around shareholder value.  In the same amendment, Driver implored First United to provide shareholders a summary of its current strategy to enhance shareholder returns, with specific initiatives in place of aspirational intentions.  Over the next three days, the trading price of FUNC stock increased to $23.16 per share.

22.     First United did not substantively respond, or provide shareholders any additional insight into the company's supposed strategy for improving shareholder value.  Indeed, First United did not release an investor presentation until October 25, 2019, long after it had set in motion its campaign to disenfranchise Driver and prevent a contested election of directors.  This demonstrated that the Board's first response to a shareholder challenging the wisdom of its strategic plan and direction was not to make its case to investors that the Board's strategic plan would produce greater shareholder value—rather, the Board's first response was to formulate a secret campaign (through direct appeals and political pressure) for the Maryland Commissioner to disenfranchise Driver. First United's campaign was premised on a strained interpretation of First United's bylaws that flouted fundamental rules of legal construction, but had the convenient attribute of suiting the Board's objectives.  Under that interpretation, stripping Driver's ability to vote would also prevent Driver from being able to nominate candidates for election to director. Upon information and belief, at no time prior to 2019 did First United ever previously embrace this interpretation of its own bylaws.

23.     On September 26, 2019, Driver released a presentation highlighting its concerns regarding First United's poor corporate governance practices.  Driver criticized the Board's excessive tenure, poor risk oversight, entrenchment and conflicts of interest, all of which Driver believed demonstrated that the Board's overwhelming objective was not to increase shareholder value but preserve a culture of cronyism.  In a press release, Driver raised the possibility of nominating candidates for director at First United's next annual meeting, typically held in May each year, unless the Board took immediate steps to increase shareholder value.

24.     By that point, if not earlier, the Incumbent Directors identified Driver as a direct threat to their continued enjoyment of their separate interests as directors (whether compensation

for their service, status in the community, lucrative business relationships or otherwise) and complete lack of accountability to which they had grown accustomed over decades of below-market performance without shareholder demands for improvement.

25.     The Incumbent Directors knew that the prospect of a sale created a conflict of interest between shareholders (who would benefit from the increased value of their investment) and themselves (since most directors would likely not continue as directors and lose the privileges and prestige associated with being on the Board).  Because the Board's share ownership was negligible compared to the monetary and other benefits they had received and would continue to derive from serving as directors, the tradeoff between increased shareholder value and the likelihood that most directors would not remain on the board was not one the Board was willing to countenance.

26.     Avoiding any potential for a sale, through whatever means necessary, immediately became an overwhelming objective for the Board, but as described below, the Board did not pursue that objective in the manner typical for other publicly traded corporations in similar circumstances (i.e., by aggressively making their case to investors, devising alternative strategic initiatives intended to increase shareholder value, etc.).

27.     On October 1, 2019, when FUNC shares were back down to $22.00, another First United shareholder issued a press release calling on the Board to immediately explore a sale.  Over the next two weeks, share prices steadily increased to $23.24.

28.     Upon information and belief, during the fourth quarter of 2019 and the first quarter of 2020, potential buyers attempted to pursue a transaction (through conversations and meetings with Defendant Rodeheaver) to acquire FUNC at or around $28.00 per share, but Defendant

Rodeheaver prevented one or more potential buyers from ever making a formal proposal by flatly asserting that First United "was not for sale."

29.     It is unknown, and therefore alleged upon information and belief, that Defendant Rodeheaver never (i) discussed these overtures with the Board, (ii) requested any analysis from First United's financial advisors regarding how potential sale values might compare to the prices at which First United might trade in the future, or (iii) discussed with First United's counsel whether a blanket rejection of a bona fide potential buyer capable of paying a significant premium to First United's all-time high trading price—without first ascertaining what price that potential buyer might pay to First United shareholders—was consistent with her fiduciary duties as a director.

30.     It is also unclear, and therefore alleged upon information and belief, that Defendant Rodeheaver instructed First United's financial advisor Raymond James to ignore those overtures when preparing its "Strategic Analyses" for the Board, the conclusions of which (but not any of the actual analyses or assumptions underpinning such analyses) were later presented to shareholders as justification for the Board's "strategy" of "remaining independent."

31.     On November 8, 2019, when FUNC shares were trading at $23.53, a third First United shareholder issued a press release calling on the Board to initiate a sale process.  FUNC shares again started a steady increase.

III.    **First United Uses Its Access To State Regulators To Instigate A Government Investigation Into Driver.**

32.     On November 19, 2019, Driver announced publicly what it had reported to First United in late October—that Driver intended to nominate three fellow shareholders to the Board: Dr. Michael J. Driscoll, Ethan C. Elzen, and Lisa Narrell-Mead.  FUNC stock closed that day at $24.48 per share.

33.     Unbeknownst to Driver, in response to what they perceived as a direct threat to their interests in remaining on the Board and anticipation of a contested election for directors at the 2020 Annual Meeting, the Incumbent Directors had been working with the company's outside counsel to develop a plan to "protect" the bank—and their individual board seats—from shareholder scrutiny.

34.     The plan was dependent on several factors: (1) a compliant state banking regulator susceptible to political pressure who would conveniently ignore due process protections; (2) the willingness of local legislators and other state officials to exert pressure on the state banking regulator; (3) an interpretation of First United's bylaws that ran contrary to both a plain reading and established rules of legal construction; and, perhaps most importantly, (4) that no one— particularly Driver and other shareholders as well as proxy advisors—would learn of the plan and its execution.

35.     If First United was successful in execution of the plan, First United would expect to either completely prevent a contested election or, in a worst-case scenario, so confuse shareholders as to the ability of Driver to vote shares and validly of nominate director candidates as to almost guarantee that incumbent directors would be re-elected at the 2020 Annual Meeting, all the while creating a substantial drain on Driver's resources.

36.     The elements of Defendants' plan were straightforward: first lobby and pressure the Maryland Commissioner to prohibit Driver from voting shares lawfully purchased, then apply a tortuous interpretation of First United's bylaws to claim that, due to the Maryland Commissioner's action, Driver (unlike any other holder of shares of First United's common stock) would be unable to nominate candidates for election to director.

37.     To be clear, the Incumbent Directors' expressed intent and objective was to prevent any challenge to the Board's ability to guarantee that incumbent directors—and not candidates nominated by a shareholder—would be elected as directors at the 2020 Annual Meeting.  This objective would be achieved by first co-opting a state agency to disenfranchise Driver and then claiming that as a result of the agency action, Driver would be precluded from nominating competing candidates for the Directors' seats, thereby depriving all shareholders the right to elect directors of their own choosing.  Paragraphs 60-79 below set out how the plan was to work.

**A.     Statutory Framework of the Banking Commissioner.**

38.     The Maryland Commissioner of Financial Regulation (the "Commissioner") is the primary state regulator responsible for overseeing Maryland-chartered financial institutions like First United (both the bank and the holding company).  The Commissioner's office is housed in the Maryland Department of Labor, Licensing, and Regulation ("DLLR").  The Commissioner is appointed by and reports to the Secretary of Labor, who in turn is appointed by the Governor.

39.     The primary function of the Commissioner is to assure the safety and soundness of State-chartered financial institutions through regular examinations, ratings, and issuance of penalties, and annually reporting his operations to the General Assembly.

40.     Like the Federal Reserve Board does with federally regulated banks, the Commissioner conducts regular examinations and engages in direct oversight to evaluate the safety and soundness of the financial institutions within its regulatory jurisdiction.  Such supervisory information is generally shielded from public disclosure under a so-called regulatory privilege or, in certain cases, a deliberative process privilege.

41.     This ongoing supervisory relationship fosters a continuous dialogue and day-to-day working relationship between the regulatory staff and the financial institutions they are responsible for overseeing.

42.     The statutory framework for the Commissioner's regulation of Maryland financial institutions like First United is set out in the Financial Institutions ("FI") article of the Annotated Code of Maryland.

43.     An entirely separate function from his supervisory role with respect to the regulated institutions themselves, the Commissioner also is authorized by statute with enforcement authority concerning unregulated persons who acquire a controlling interest in a Maryland bank or bank holding company.   Reflecting these roles, the Commissioner's office is separated into a supervisory branch and a distinct enforcement branch.

44.     The Commissioner is empowered by Title 2 of the Financial Institutions article (specifically FI §§ 2-113 through 2-116) to investigate and enforce actual and suspected violations of the Financial Institutions article, including the seldom-used FI § 3-314, entitled "Approval of Commissioner of certain stock transactions."

45.     In general terms, Section 3-314 provides that a person who intends to make a "stock acquisition" in a Maryland bank or bank holding company shall first apply to the Commissioner sixty (60) days prior to the proposed purchase, for the Commissioner to determine if the proposed acquisition is anticompetitive or a threat to the safety or soundness of the banking institution. "Stock acquisition" is defined as either (i) acquiring 25% of the voting stock of a commercial bank, or (ii) otherwise acquiring voting stock that "will affect the power to direct or to cause the direction of the management or policy" of the banking institution or holding company.  Section 3-314 does not state what percentage of stock ownership triggers its requirements.

46.     Section 3-314 was enacted in 1965 to address changes in control over a regulated financial institution.  It was later amended in 1979 for the stated purpose of bringing Maryland law into conformity with federal law as reflected in the Bank Holding Company Act, 12 U.S.C. § 1841.

47.     The Financial Institutions article does not define what it means to "affect" the power to direct management or policy of a financial institution, but in reorganizing the code to its current formulation, the legislature was clear that the language was "derived without substantive change" from the predecessor statute.  For its part, the DLLR (which houses the Commissioner's office) advised that it understood the 1979 law to apply only to a "purchaser of control or 25% of bank stock."

48.     As amended, Section 3-314 authorizes the Commissioner to deny approval for a proposed acquisition when he determines it to be anticompetitive or "to threaten the safety or soundness of a banking institution."  The statute provides that "[v]oting stock that is acquired in violation of this section may not be voted for 5 years."

49.     Section 3-314 was recodified into its current form in 1980.  Sections 2-113 through 2-116 (related to the Commissioner's enforcement authority) were enacted in 2000, and the Commissioner's office was first funded to operate under them in fiscal 2001.

**B.     The Commissioner's Interpretation and Use of Section 3-314 Prior to 2019.**

50.     While the Commissioner has over the years reviewed some number of applications made to it under Section 3-314, prior to 2019 it had never before opened an investigation into, or filed a civil action against, any purchaser of shares in a Maryland bank or bank holding company for an alleged failure to pre-clear with the Commissioner the intended or actual purchase of a controlling interest (or an interest that will or may "affect the power to direct . . . management or policy") therein.

51.     When Driver purchased FUNC shares in open market purchases in 2019, there was no indication that the Commissioner ever had considered such purchases as "affecting the power to direct . . . management or policy" of a Maryland financial institution or that he had ever regarded Section 3-314 as requiring pre-approval for such minority holdings.

52.     To the contrary, the public filings of these Maryland-chartered financial institutions for the same period (year ended December 31, 2019) all reflect ownership interests of individual investors well in excess of 5% (listed below), but the Commissioner has no record of a pre-approval application from any of them, and confirms that he did not open an investigation under FI § 3-314 into any of them for not having sought pre-approval:

|  | Bank | Ownership Interest |
|---|---|---|
| a. | **Eagle Bancorp, Inc.** | |
| | • BlackRock, Inc. ("Blackrock"): | 14.9% |
| | • The Vanguard Group ("Vanguard"): | 9.74% |
| | • Wasatch Advisors, Inc.: | 9.30% |
| b. | **Sandy Spring Bancorp, Inc.** | |
| | • Blackrock: | 8.6% |
| | • Dimensional Fund Advisors LP: | 5.7% |
| c. | **Shore Bancshares, Inc.** | |
| | • Fourthstone, LLC: | 9.2% |
| | • Blackrock: | 6.6% |
| | • Vanguard: | 5.4% |
| d. | **Delmar Bancorp** | |
| | • Kenneth Ray Lehman: | 41.4% |

53.     Consistent with the federal law to which it was intended to conform, the Commissioner has consistently interpreted Section 3-314 as not requiring pre-approval of anticipated purchases of a 5% minority interest in Maryland-chartered financial institutions.  And the Commissioner historically applied this same interpretation to First United and its investors.

54.     In advance of the 2020 annual meeting, First United filed a Schedule 14A proxy statement disclosing that the families of two FUNC investors, Donald Moran and Lloyd Green, hold in the aggregate approximately 5.4% of FUNC shares, and that they would be supporting First United's candidates in the election.  The Commissioner has confirmed that he has no record of these investors having sought pre-approval to acquire their shares in First United, and that he has no record of having ever opened an investigation into them under Section 3-314.

55.     To raise funds in 2017, First United offered its existing shareholders the right to purchase newly-issued shares in the company, at a discounted price to market value, in proportion to their current holdings.  To facilitate the offering, First United entered into "Standby Purchase Agreements" with a hedge fund (Second Curve funds) and a private equity fund (Castle Creek funds), under which the two funds agreed to purchase any shares not acquired by existing shareholders.  In other words, the two funds agreed, if the shares were available, to purchase up to 783,626 new shares of FUNC (about 10% of the company) at a predetermined price.  Neither of the funds applied to the Commissioner for advance approval of the proposed purchase, even though their obligations to purchase shares of FUNC stock would have occurred within sixty (60) days of the date of the Standby Purchase Agreement.  The Commissioner did not open an investigation under FI § 3-314 into either of the entities.  Even more tellingly, First United did not specifically require either of the two funds to obtain approval from the Commissioner pursuant to FI § 3-314.

56.     Driver's criticism of First United's governance was vocal, and public, as early as March 2019.

57.     On August 28, 2019, Driver's beneficial ownership of FUNC shares increased from 4.970% to 5.005%, and Driver publicly filed a Schedule 13D the next week, disclosing its interest.

58.     Consistent with its practice in such matters, the Commissioner made no inquiry and took no action with respect to Driver's non-controlling interest in the company.  Notwithstanding the absence of a statutory violation, First United and its Incumbent Directors saw an opportunity to silence a critical voice and quash shareholders' ability to consider alternative representation on the board.

59.     Driver's minority interest in FUNC does not confer any special rights or control, or enable it to determine or materially influence the outcome of any matter put to the vote of FUNC shareholders.  Its only influence with respect to FUNC's management and policy is its limited voting power and its ability to persuade First United's board, management, and other shareholders of the strength of its arguments, just like any other minority shareholder.

**C.     First United's Plan to Disenfranchise Driver and Invalidate Its Nominations.**

60.     First United's regulatory counsel is Andrew Bulgin ("Bulgin") at Gordon Feinblatt, LLC, f/k/a Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC ("Gordon Feinblatt"). Gordon Feinblatt, and Bulgin in particular, regularly participated in oversight discussions with the Commissioner's staff and the Commissioner himself.  Bulgin was on a first-name basis with the Commissioner, his assistant commissioners, the regulatory staff, and counsel.

61.     Bulgin also regularly consulted with First United management and Directors (most frequently but not exclusively with Defendant Rodeheaver) about Driver's stated concerns.  Tonya Sturm, First United's chief financial officer and secretary, regularly forwarded Driver's communications to Bulgin, who worked closely with First United in crafting its reactions, responses, and strategies throughout 2019.

62.     Driver's criticisms of the Directors' governance and policies went largely unanswered by the company, and as summarized above, Driver's entreaties to management increased in frequency throughout August and September 2019.

63.     In an effort to silence Driver and protect the Directors' seats on the board of directors, First United and its Directors adopted a plan with Bulgin's help.

64.     Seizing on statutory language that violations could result in the loss of voting rights for five years, First United initiated a campaign to lobby the Commissioner to open an investigation into Driver for the express purpose of finding that its purchase of FUNC stock was in violation of FI § 3-314.  A primary reason to invalidate Driver's voting rights was to claim that doing so also would invalidate Driver's nominations of candidates to the board of directors.

65.     First, Bulgin e-mailed his contacts at the Commissioner's office to find out whether Driver had submitted an application to the depository institutions side of the office before purchasing shares of FUNC.  Bulgin supplemented the e-mail with a request under the Maryland Public Information Act ("MPIA," the Maryland analogue to FOIA) on October 9, 2019.

66.     By the following day, October 10, 2019 (Thursday), the assistant commissioner for depository corporate activities had determined that the office had no record of any "stock acquisition" applications responsive to First United's MPIA request.  The staff reached out to Bulgin by telephone the following Tuesday, then "set up a time to chat" with him later that week.  On Friday, October 18, 2019, the staff formally confirmed that the Commissioner had no record of an application under FI § 3-314 within the preceding five years.

67.     With that confirmation, Bulgin got to work preparing a detailed petition imploring the Commissioner to open an investigation into Driver for the express purpose of stripping away

Driver's voting rights.  Bulgin completed the submission and dossier on October 31, and had it hand-delivered to the Commissioner on November 1, 2019.

68.     Recognizing that "[o]bviously, the Maryland Commissioner has jurisdiction with respect to violations of Section 3-314 of the FI Article," First United attempted to persuade the Commissioner to agree with the bank's theory:  "Because Driver did not file an application with respect to such acquisitions [of FUNC stock], we believe that Driver violated Section 3-314 of the FI Article and is therefore prohibited from voting any of its shares of the Company's common stock for five years."  First United appears to contend that no finding or other due process is required before Driver "is" prohibited from voting its shares.

69.     First United was explicit about its intention and objective:  "We hereby respectfully request that the Maryland Commissioner exercise its authority pursuant to Sections 2-114 and 2-115 of the FI Article and immediately investigate this matter and take such other actions with respect thereto as it deems appropriate, including . . . prohibiting Driver from voting any of its shares of the Company's common stock for the next five years . . . ."  First United then pledged to assist the Commissioner with its investigation in any way that it could.

70.     First United's submission was premised on multiple false and misleading assertions, including *inter alia*:

    a.  that Section 3-314 governs any effort by shareholders to influence management decisions other than through a change in control, such as by communicating with management;

    b.  that filing a SEC Schedule 13D constitutes an "admission" that the filer intends to exercise control over the target company;

c. that repeated calls for management to consider a sale equate to "forcing" a sale onto company management;

d. that publicizing a shareholder's views regarding the prudence (or imprudence) of management decisions constitutes unlawfully "influencing" other stockholders in their views;

e. that stating an intent to nominate candidates to stand for election against incumbents constitutes an effort to "control the strategic direction" of the company in violation of FI § 3-314;

71.     All of the foregoing premises are false.  Driver did not obtain any special rights by virtue of its minority holdings; it could have issued press releases, contacted management, nominated director candidates, and otherwise made its views known whether it owned 5%, or 1%, or even a single outstanding share of FUNC.  Driver lacked any power to force the board of directors to do anything, except insofar as every shareholder has the power to make its opinions known.  And Driver's Schedule 13D explicitly disclaimed rather than embraced any intent to exercise control over management.  In addition, despite First United's frenzied claims about Driver's ability "to direct or to cause the direction of the management or policy," the fact remained that the Board was fully capable of resisting Driver's "demands" at all relevant times.

72.     Yet, the false statements above feature prominently in First United's argument to instigate an investigation of Driver.  First United asserted that the "distraction" to the board and management of having to respond to shareholder concerns voiced by Driver threatened a "risk to the continued safety and soundness of the Company and the Bank."  That assertion also was false. To a regulator charged with protecting the safety and soundness of the institutions it supervises, such an allegation is tantamount to yelling "fire" in a crowded theater (not to mention calling into

question the competence of management to adequately attend to running the company for the shareholders they ostensibly serve).

73.    All of these efforts were designed and intended to encourage a finding by the Commissioner that Driver had violated FI § 3-314, so that First United would not have to count Driver's votes at the upcoming annual meeting, and would not have to recognize Driver's nominees as candidates for election by a plurality of shareholders to the board of directors.

74.    First United admitted that its intent was to strip Driver of its voting rights and deny the validity of its nominations.  In an informal e-mail December 13, 2019 to the Commissioner, his legal counsel, and his staff, Bulgin complained about the bad press First United was likely to receive if it ignored another of Driver's concerns—this one relating to plurality voting.   In surprising candor, Bulgin conveyed:

> First United does not want to . . . take some action that could be seen as an acknowledgement that Driver's nominations are valid.  Of course, this issue completely dissolves if he is prevented from voting and, thus, making nominations, and I was hoping that we might have some clarity on the outcome of the investigation.

75.    The whole purpose of First United's campaign was to prevent Driver's nominations from being able to stand for election at the annual meeting (tentatively in May 2020), thereby ensuring that shareholders could not elect any directors other than the Incumbent Directors.  In a revealing e-mail, Bulgin explained as follows, in reference to the Board's decision to only provide for plurality voting at a contested election[5] by way of a Board resolution and not an amendment to its bylaws:

---

[5] At the time of Bulgin's e-mails to the Commissioner regarding the plurality-carve out, First United had a majority voting standard for the election of directors in all elections, contested or not, which meant that only directors who received a majority of the votes cast would be elected. The majority voting standard is disfavored in contested elections, since it is possible that neither competing candidate may receive a majority of the votes cast, resulting in neither candidate being elected and creating a vacancy that, generally speaking, the board of directors can fill with their

At the expense of burdening you with too much information, I wanted to make it clear that in adopting a plurality carve-out to the majority voting standard, the [Board] in no way acknowledged, or intended to acknowledge, that Driver's nominations should be given effect or that Driver should be able to conduct a proxy contest with respect to the 2020 annual meeting.  We and the Company continue to believe strongly that Driver's acquisitions of First United Stock violated FI Section 3-314 and that Driver is prohibited from voting its shares for 5 years.  **You will notice that the Board was very careful in how it worded the carve-out:  IF there is a contested election at the 2020 annual meeting, then the carve-out will apply.  If there is no contested election because it is determined that Driver is not entitled to vote its share [sic] or, thus, submit director nominations, then the carve-out approved by the Board will be rendered moot.  Because we do not yet know what position the DLLR will take, the Company's strategy for dealing with Driver must assume the worst.** [Emphasis added.]

76.     It should go without saying that a Board engaged in the faithful exercise of its fiduciary duties and that respects the rights of shareholders would not consider the free exercise of shareholders' right to nominate and vote to elect directors the "worst."

77.     In addition to the November 1 submission explicitly advocating to cancel Driver's shareholder rights (which according to First United, also removes its right to nominate candidates), on November 19, 2019, Bulgin again e-mailed the Commissioner, his counsel, and his staff, to advise that Driver had announced an intention to nominate three director candidates, leading Bulgin to ask for an update on the "resolution" of the FI § 3-314 claim First United was pushing, "and the timing of any correspondence to Driver."  "Now that Driver has publicly announced its intention to nominate candidates," he continued, "I don't think the timing of DLLR's letter really matters at this point."

78.     The following day, Bulgin e-mailed again to assert that "it would seem to me that the [nominees] too have engaged in a stock acquisition for purposes of FI Section 3-314."

---

nominee.  Best practices in corporate governance call for a "plurality carve-out," whereby, in the event of a contested election, the candidate that receives the most votes (regardless of whether it is a majority of votes cast) wins.

79.     First United continued this refrain for months.  By March 30, 2020, FUNC filed a preliminary proxy statement in which it discussed the Commissioner's investigation and opined: "If Driver Management is ultimately prohibited from voting its shares of Common Stock or nominating the Driver Nominees, then any proxy that you deliver to Driver Management will be void and your vote will not be counted."  Upon review, the SEC advised that the stated opinion did not flow directly from the language of the company's bylaws and directed First United to remove it.  But its inclusion in the draft demonstrates First United's intent.

**D.     First United's Efforts to Cover Its Tracks.**

80.     First United developed its theory of liability under FI § 3-314 and presented it to the Commissioner on November 1, 2019, but First United said nothing about it publicly, or to investors, or to Driver itself.

81.     Instead, First United's strategy depended on persuading the Commissioner to launch an investigation without disclosing First United's role, thereby enabling the bank to deny that it had anything to do with the allegations, and point to Driver as "under investigation" or, better yet, "in violation of Maryland law."  The Board knew that shareholders and proxy advisors—including Institutional Shareholders Services ("ISS") and Glass-Lewis, which provide proxy voting advice to institutional investors—would view First United's plan to prevent a contested election by causing the Commissioner to prohibit Driver from voting its shares and its role in instigating and directing the Commissioner's investigation as information that was not only highly material to their voting decision (or, in the case of the proxy advisors, their recommendation), but also information that would likely cast an extremely negative light on the Board, its respect for shareholders' rights and its commitment to good corporate governance practices.

82.     To keep its campaign secret, First United claimed that its November 1 submission somehow constituted "information obtained in the course of . . . examin[ing] the Company and the Bank," such that it should be shielded from disclosure under the regulatory privilege.   That assertion, too, was false.   First United knew that lobbying the Commissioner to open an investigation into Driver was unrelated to any examination of the bank or its holding company, and totally independent of any legitimate supervisory activity by the Commissioner.

83.     For its part, the Commissioner's office also knew that none of First United's investigation-spurring submissions were properly characterized as "examination materials" or "supervisory information."

84.     First United's true motivation was to avoid having to disclose that the investigation, should one be opened, was in fact instigated by First United, and that First United was actively encouraging both its progress and its pre-determined outcome.   First United was fully aware that proxy advisory firms and other shareholders would review the actions of both sides leading up to a proxy fight, and the Company did not want to be seen as acting in a way that was contrary to even the most rudimentary notions of equity, good corporate governance, and fairness to shareholders.

85.     First United's intent was clear.   After submitting its November 1 exposition, Bulgin e-mailed Commission staff (including counsel) that "[i]f you decide to send any correspondence to third parties and feel it appropriate to copy me or the Bank, I would appreciate that those be blind-copies so that neither my name nor the Bank's name is associated with anything you send out."

86.     First United supplemented its November 1 petition and e-mail with scores of unsolicited submissions, additional legal analyses, and reports of ongoing concerns raised by

Driver with respect to failings in First United management.  Bulgin captioned his November 4 e-mail to the Commissioner's staff "CONFIDENTIAL SUPERVISORY INFORMATION."  He did the same on November 6, and November 7, and again November 19, 20, and 21.  The December 13 e-mail referenced above was captioned "CONFIDENTIAL SUPERVISORY INFORMATION," as were multiple submissions throughout January, February, and after.

87.    Another example is First United's January 17, 2020 submission of a legal analysis of the claim First United wanted the Commissioner to bring.  Again, Bulgin falsely represented that the argument reflected "information obtained in the course of exercising the Maryland Commissioner's authority to examine First United and the Bank," even though it had nothing at all to do with an examination.

88.    The following month, Bulgin e-mailed Commission staff about their (now open) investigation of Driver, removing any doubt that First United was trying to hide its role in the investigation from public scrutiny:  "I don't know when your meeting with Driver is, but, **as I stated during our meeting, it is extremely important to FUNC that Driver not come away from that meeting feeling that FUNC instigated your investigation**." [Emphasis added.]

89.    As detailed below, *see* Paragraphs 124-153, First United lied about its involvement in the investigation in filings before the SEC, claiming that First United did not prompt or influence the investigation into Driver's acquisition of the Company's shares.

## IV.    <u>First United's Campaign To Pressure The Commissioner To Act.</u>

### A.    <u>The Commissioner's Initial Response.</u>

90.    The Commissioner was receptive to First United's campaign in November 2019. But as he had never previously investigated anyone for allegedly failing to comply with FI § 3-314—an exercise solely within his jurisdiction—the Commissioner had no idea how to go about conducting an investigation such as First United was pressing.  Accordingly, his initial view of the

law and procedure was heavily (and exclusively) influenced by First United's false and misleading analysis.

91.     At First United's urging, the Commissioner and his staff drafted findings dated November 7, 2019, before an investigation was even opened, purporting to find a violation of Section 3-314 and invalidating Driver's voting rights.  The Commissioner then scheduled a call with Bulgin to discuss the draft and how to proceed.  In addition to his staff, the Commissioner invited an Assistant Attorney General to participate in the call.

92.     The Commissioner's enthusiasm dissipated on Wednesday, November 20, 2019. That was the day the Commissioner obtained the benefit of further analysis from his staff and the AAG concerning First United's theory.  His internal summary advised him that:

    a.  Federal law requires filing a Schedule 13D whenever a person's equity ownership exceeds 5% of the outstanding shares, that Schedule 13D requires a statement of purpose or intent, and that filing a Schedule 13G is optional;

    b.  Driver's Schedule 13D filed August 28, 2019 expressly *disclaimed* any intent to do that which Bulgin and First United had asserted—exercising control over management of the company;

    c.  FI § 3-314 was originally enacted to address a change in control, defined as acquiring 25% or more of outstanding stock or the "power to direct or cause the direction" of management;

    d.  FI § 3-314 was amended in 1979 to authorize the Commissioner to deny a proposed acquisition and to add the voting prohibition, with the express intent that the 1979 amendment would "conform the requirements as to stock acquisition to the federal law, *i.e.*, the Bank Holding Company Act, 12 U.S.C § 1841 *et seq.*, and *inter alia*,

e.   The Bank Holding Company Act governs those who "exercise[] a controlling influence over the management or policies".

93.    Perhaps most importantly, the Commissioner was advised that Driver's voting rights are subject to Due Process protections:  "Since stock is personal property, and voting power is a common shareholder right, without hitting the 25% threshold, if the Commissioner issues a letter to Driver stating th[at] Driver's failure to apply to the Commissioner prior to acquiring the 5.08% of common share in First United Corporation ("United"), Driver could make a 14th amendment claim that the Commissioner is depriving Driver of its property right."

94.    The Commissioner's advisory memo recommended that in light of the federal standards, he contact the Federal Reserve Board about First United's theory before taking further action under FI § 3-314.

95.    Following November 20, 2019, the Commissioner took no action against Driver, although he continued to receive dozens of unsolicited e-mails and submissions from Bulgin and First United.

**B.    First United Leans on the Commissioner for Action Against Driver.**

96.    Despite repeated e-mails and other inquiries to the Commissioner's office, First United was not certain by January 2020 whether the Commissioner had ever opened the investigation for which it had been lobbying.  So First United enlisted the help of State Senator George Edwards, Garrett County Delegate Wendell Beitzel, and representatives of Governor Hogan's office to pressure the Commissioner into taking action against Driver.

97.    In early January, responding to continued pressure from First United and from elected officials, the Commissioner expressed to Bulgin his uncertainty that it was appropriate for him to pursue an investigation of Driver.  In response, Bulgin sent the Commissioner an e-mail (addressed to "Tony") explaining that the enforcement sections of Financial Institutions Title 2

(§§ 2-114 through 2-117) "unquestionably" authorize the Commissioner to go after Driver.  In the same e-mail, Bulgin requested a short in-person meeting with the Commissioner to discuss "some final thoughts".

98.     On January 15, 2020, prompted by requests from the Incumbent Directors, Senator Edwards and Delegate Beitzel contacted the Governor's office to request a meeting with the Secretary of Labor, the Commissioner, and Defendant Rodeheaver, to discuss the investigation for which First United had been lobbying since October 2019.  That meeting was scheduled for January 22, 2020.

99.     On January 21, 2020, the day before his meeting with the elected officials and his boss, the Commissioner had his Director of Enforcement notify Driver that the Commissioner's office opened an investigation under FI § 3-314 into Driver's purchase of FUNC stock.

100.     Bulgin and First United coordinated closely with the Commissioner, and expected notice of the investigation to stop Driver in its tracks.  When Driver continued to make statements critical of the Incumbent Directors on January 22, 2020, Bulgin concluded that Driver must not be aware of the inquiry, in an e-mail to an assistant Commissioner:  "the fact that Abbott Cooper . . . filed additional soliciting material today makes me think that Abbott has not received the Commissioner's letter."

101.     That was the same day, January 22, 2020, the Commissioner and his boss, Secretary of Labor Tiffany Robinson, met in Senator Edwards's General Assembly office with Delegate Beitzel, representatives of the Governor, Defendant Rodeheaver, and Bulgin, for the purpose of discussing FUNC's allegations.

102.    By January 27, 2020, Bulgin was e-mailing the Commission staff, reflecting both the close involvement of First United in launching the investigation as well as the highly improper coordination between the Commissioner's office and the bank:

> I'm curious whether your office has gotten any response from Driver, either a substantive response or a simple acknowledgement of receipt of the letter that was sent to Driver.  If you could let me know either way, that would be helpful . . . . [Driver] is continuing to file soliciting material with the SEC regarding his campaign, and that has everyone feeling a bit nervous that maybe he doesn't regularly check his post mail and might not have seen the letter."

103.    On January 28, 2020, before Driver had even gotten to respond to the January 21 letter (received January 23), the Commissioner issued a subpoena to Driver, directing production of information related to Driver's investment activities "which may affect the power to direct or cause direction of the management of policy of First United Corporation."

104.    From February 11-13, 2020, the Governor's office reported privately to Senator Edwards that the Commissioner was planning to coordinate with First United about the investigation and that there has been "lots of communication with the investor [Driver]," and Senator Edwards in turn notified Rodeheaver of the Commissioner's progress.

105.    On February 28, 2020, Driver responded to the subpoena, maintaining the absence of any FI § 3-314 violation and setting out a comprehensive analysis refuting the premise of the investigation, which conflicts with the federal law with which the statute is supposed to comport. At the time, Driver was unaware that First United had instigated the investigation, and Driver had not seen the November or January analyses submitted by First United to the Commissioner.

106.    On March 12, 2020, Senator Edwards again contacted Secretary Robinson because he was "anxious to have this resolved," and on March 23, the Commissioner issued additional requests to Driver.

107.    On March 26, 2020, one of FUNC's board members, Defendant Gary Ruddell, appealed to Senator Edwards and Delegate Beitzel, copying other FUNC directors, expressing frustration that the Commissioner had not yet found a violation by Driver.

108.    The lawmakers responded the same day, again asking Secretary Robinson to "help the bank" deal with Driver, and again asking the Governor's office to intercede.

109.    Throughout this period, First United continued to delay setting the date for its annual meeting until it could obtain assurances that Driver's voting rights were likely to be impacted or undermined.

110.    On April 16, 2020, Driver submitted a supplemental response to the Commissioner's March 23 requests, explicitly questioning First United's role spinning up the investigation.

111.    The next day, First United filed its definitive proxy statement with the SEC, setting the annual meeting for June 11, 2020 and supporting the candidacy of Defendants John W. McCullough, John F. Barr, Brian R. Boal and Marisa A. Shockley for the election to Board of Directors.

## V.    First United Aggressively Markets The Presumed Effect Of The Investigation Without Waiting For The Commissioner To Actually Find Liability.

### A.    First United Misrepresented the Effect of the Investigation.

112.    At every opportunity, First United attempted to capitalize on the existence of the Commissioner's investigation to imply that Driver's position lacked merit, to call into question Driver's ability to vote, and to confuse investors as to the validity of Driver's nomination of candidates for election to the board.

113.    First United's press releases and proxy statements are subject to 17 C.F.R. § 240.14a(9), which prohibits it from making any false or misleading statements regarding a material fact.

114.    As noted above, on March 30, 2020, First United released its preliminary proxy statement, including the misleading assertion that "If Driver Management is ultimately prohibited from voting its shares of Common Stock or nominating the Driver Nominees, then any proxy that you deliver to Driver Management will be void and your vote will not be counted." The SEC challenged this assertion and directed First United to remove it from the proxy statement.

115.    On April 7, 2020, First United issued an amended preliminary proxy statement, again citing the mere existence of the investigation as a reason to discount Driver's position, as though it were the product of the Commissioner's independent inquiry: "The Board . . . strongly and unanimously urges you to **NOT** sign or return any proxy card sent to you by Driver Management.  Driver Management is currently being investigated by the Office of the Maryland Commissioner of Financial Regulation (the "Maryland Commissioner") for acquiring shares of the Corporation's stock in violation of Section 3-314 of the Financial Institutions Article . . . ."

116.    The April 7 proxy asserted that the company's bylaws permitted nominating director candidates "only if that person is a shareholder who is entitled to vote for the election of directors."  The company's intent was to dissuade shareholders from signing proxy cards in support of candidates for whom an adverse finding by the Commissioner as to Driver could invalidate the nomination as to the director candidates.

117.    The SEC disagreed that the company bylaws said what First United claimed.  In a letter dated April 7, 2020, the SEC noted that First United's interpretation did not flow necessarily from the language of the bylaws, and asked whether First United had obtained "an opinion of

counsel to support its view."  First United had not been able to obtain, or had not requested, an opinion from either of the two law firms then representing First United (or any other) that its stated interpretation of the bylaw provision was correct.

118.    Upon information and belief, at the time of its representations to investors and to the Commissioner, First United knew that its bylaws did not support the conclusion that Driver's nominations would be invalid, even assuming the Commissioner had attempted to strip Driver's voting rights under FI § 3-314.

119.    When First United filed its definitive proxy statement on April 17, it retained the headline and summary that Driver was "currently being investigated."  First United also retained its argument that Driver's nominations would not be valid if Driver is unable to vote—an argument for which it had not obtained a supporting legal position—but modified the language to say that it was the company's "view" or "position," or its "interpretation" of the bylaw provisions.

120.    First United also included—now known to have been at the direction of the SEC— a statement that if the Commissioner has not acted by the date of the annual meeting, then Driver "would be able to make its nominations" at that meeting.

121.    As the meeting approached, First United was exerting more and more pressure on the Commissioner to complete his inquiry and make some kind of decision, so it could supplement its proxy statement and more definitively undercut Driver's voting rights and nominations.

122.    At the same time, the Commissioner was feeling pressure of his own, because Driver had submitted its own MPIA request to DLLR, through which it soon would learn all of the facts about First United's campaign that so far been kept secret.  As of May 11, 2020, Commission staff already were actively forwarding to the MPIA production coordinator documents responsive to Driver's MPIA request—including the dozens of e-mails, entreaties, demands, and requests

submitted to the Commissioner by First United, the Incumbent Directors, and their advisors and proxies.

123.    For its part, First United ratcheted up the rhetoric.  On May 12, 2020, still with no word from the Commissioner, the Company issued a press release again falsely stating that the mere existence of the investigation showed that Driver had violated FI § 3-314.  First United stated: "The fact is that Driver is under investigation by the [Commissioner] with respect to Driver's acquisitions of shares of First United in violation of Maryland law."  First United also denied its role in instigating it.

**B.      First United Lied About Its Role in the Investigation.**

124.    By May 14, 2020, the Commissioner was not prepared to find that Driver had violated FI § 3-314, but he needed to appease First United and its surrogates.  That day, he wrote a letter to Driver advising that his staff was recommending a finding that Driver had violated FI § 3-314.  The Commissioner himself had not reached any conclusions or made any findings, but he indicated that he would consult the state Attorney General's office as to what steps, if any, he should undertake.  At First United's request, the Commissioner agreed to send a courtesy copy of the letter to First United.

125.    Driver issued a press release on Friday, May 15, 2020, making the Commissioner's May 14 letter public and questioning whether First United played a role in the Commissioner's investigation.  Driver suspected that First United had been working behind the scenes to drive its agenda through the Commissioner, but Driver could not know with certainty, and First United repeatedly denied having been involved.

126.    First United did not wait for the Commissioner to make findings or reach a conclusion that someone (anyone) had actually violated any statute; the implication was enough.

But for the implication to be credible, First United had to convey the false impression that it was independent—*i.e.*, that Driver had not been operating behind the scenes to push the agenda.

127.   In multiple SEC filings, First United had already denied that the company was behind the investigation, and implied—or stated outright—that the investigation was a matter solely between the Commissioner and Driver resulting from independent action by the Commissioner.  These statements were false or exceptionally misleading, including the following:

a.   On April 17, 2020, FUNC filed its definitive proxy statement, discussing in detail its views as to the possible outcomes of the Commissioner's investigation.  But FUNC was silent as to its role in conceiving the legal theory and strategy, and lobbying the Commissioner to launch it, facts that an ordinary reader naturally would expect to be included if First United had played a role in provoking the investigation.  The omission of First United's role created a false impression that it had not lobbied for or otherwise pressured the Commissioner to open the investigation.

b.   The same April 17 proxy stated that on February 19, 2020, First United's counsel was interviewed by representatives of the Commissioner's office (the first published reference to any contact between the Commissioner's office and FUNC or its advisors).  A reasonable person reading this statement would conclude that the referenced exchange was the first contact between FUNC representatives and the Commissioner regarding an investigation into Driver's acquisition of shares, which is false.

c.   On May 12, 2020, FUNC filed additional proxy materials stating "we have not sought to unduly influence or control the outcome of this investigation."

d.  On May 15, 2020, FUNC issued an investor deck as solicitation material, including this statement in response to Driver speculating that Defendant Rodeheaver was using her connections to influence the Commissioner:  "Driver's claim that Ms. Rodeheaver used her position as Chairman of the Board of the Maryland Bankers Association to influence the Maryland regulator's investigation is completely false."  In reality, Defendant Rodeheaver had not gone through the trade group; it was worse—she went directly to the Commissioner himself (and the Governor, and a State Senator, and a County Delegate, and the Secretary of Labor).  A copy of the May 15 slide is attached here as Exhibit D (p. 19).  The entire purpose of the slide is to convey that First United played no role instigating the Commissioner's investigation, and did not try to influence it:  "This is a matter between Driver and the regulator, and Driver is making yet another false assertion to try to blame First United . . . ."  First United intended to convey the false impression that the Commissioner, on its own initiative, identified and pursued Driver for a supposed violation of Maryland law.  The whole slide is false and misleading.

128.  All of these actions and statements by First United were designed and intended for the express purpose of misleading other shareholders as to the genesis and purpose of the Commissioner's investigation, to falsely convey that the Commissioner had acted independently, and to falsely convey that First United had not played a role in conceiving, advocating for, and constantly pressuring the Commissioner to strip Driver's voting rights and (under First United's novel interpretation of its bylaws) invalidate the nominations for competing directors.

129.  All of these statements were made in SEC filings subject to federal prohibitions on making false or materially misleading statements.

130.     By the weekend of May 16-17, 2020, the company, Incumbent Directors, and counsel all thought they had managed to keep secret the role they played in aggressively pushing the Section 3-314 narrative.  Bolstered by their expectation that their months of campaigning would remain secret, they authorized a statement early Monday morning, May 18, flat-out lying about the company's role, the actions of its executives, and the presumptive independence of the Commissioner's investigation.  This is what they said:

a.   "First United did not instigate, direct or control the investigation into Driver's acquisition of the Company's shares,"

b.   "[N]or did any of First United's executives use their positions or relationships . . . to influence the investigation."

c.   "Any failure to comply with Maryland law . . . is the sole responsibility and fault of Driver and no one else."

131.     Each of these statements is false or actionably misleading.  As to subparagraph (a), First United absolutely did instigate the investigation.  Hardly any other word as fairly characterizes what it means to prepare a (flawed) legal analysis, tell the Commissioner what his legal authority was, and explicitly ask him to exercise that authority to open an investigation that he otherwise had no intention of opening.  As to subparagraph (b), the ellipses refer to trade associations, attempting to convey that whatever actions Defendant Rodeheaver and other FUNC representatives took, it wasn't through trade associations.  Such a carve-out hardly changes the central meaning of the statement denying that FUNC executives used their positions and relationships to influence the investigation—something they absolutely did.  Subparagraph (c) falsely implies that the Commissioner acted independently on the basis of his own judgment and

prosecutorial discretion, rather than at the behest of First United and the intense lobbying campaign it brought to bear.

## VI.   First United Lied About The Effect Of The Investigation And Filed A Frivolous Lawsuit.

132.   When First United issued its press release that Monday morning May 18, it did not know that the preceding Friday afternoon, DLLR had produced documents to Driver in response to Driver's long-pending MPIA request.  That production for the first time revealed the extent of First United's involvement in conceiving, instigating, and encouraging the Commissioner's investigation.

133.   By May 18, the Commissioner had not adopted the recommendation of his staff concerning a potential violation (and would later go on to specifically disclaim any such finding). Driver sought assurances from First United that it would honor Driver's shareholder rights at the upcoming annual meeting, unless and until a final and binding determination that Driver had violated FI § 3-314.

134.   Driver thereafter issued a press release disclosing selected documents obtained from the MPIA production—documents that directly refuted First United's denials of involvement earlier that morning.

135.   On May 20, 2020, in lieu of providing the requested assurances, First United filed a declaratory action against Driver in the Circuit Court of Maryland for Garett County, Case No. 11-CV-20-42.  The Garrett County Circuit Court has one judge, the Honorable Raymond G. Strubin.  Judge Strubin recused himself *sua sponte* on June 2, 2020.

136.   The pretextual premise of the lawsuit is that the Commissioner found in his May 14 letter that Driver had violated FI § 3-314.  That premise was false when made, and known by the Company, the Incumbent Directors, and its counsel to be false when advanced by First United.

137.    In its complaint, First United alleged: "[i]t is undisputed that [Driver's] acquisition[] of shares of First United common stock constituted a 'stock acquisition' as defined by FI Article § 3-314(a)." Ex. B, Compl. ¶ 17.  That statement was knowingly false when made.

138.    First United also claimed that as of May 20, the Commissioner "has determined that [Driver's] stock acquisitions violated FI Article §3-314." *Id.*  That statement also was knowingly false when made.

139.    First United requested that the Circuit Court declare, *inter alia*, that Driver is prohibited from casting votes at the June 11, 2020 annual meeting, that First United is not required to count Driver's votes at the meeting, and that Driver cannot exercise its voting shares in FUNC for five years.

140.    First United transmitted a copy of the complaint to Driver that afternoon, explaining that "[b]ased on conclusive findings of the Maryland Regulator, First United does not intend to count votes attributable to First United common stock owned by Driver . . . at First United's 2020 annual meeting of shareholders."

141.    On the same day, May 20, First United filed a supplemental proxy statement with the SEC, repeating or otherwise asserting the following false or actionably misleading statements to all shareholders:

    a.  that the Commissioner issued letters "in which it concluded . . . that there is sufficient evidence to find" that Driver and its nominees violated FI § 3-314.

    b.  that Driver "ignore[d]" the Commissioner's May 12 letter "as well as Maryland law."

    c.  that Driver cannot exercise its voting shares for five years because it violated FI § 3-314.

d.  First United characterized the nature of the state court declaratory action as to "confirm . . . that Driver and its proposed candidates are prohibited from voting."

e.  "First United did not instigate the Investigation."

f.  "Driver was found to be in violation of Maryland law."

g.  "[Driver] is prohibited from voting its shares at the Company's upcoming Annual Meeting."

h.  "First United's executives [did not] use their positions or relationships . . . to influence the investigation."

i.  Driver was not operating "within the confines of the law."

142.   The claim stated in the complaint was entirely pretextual.  The Commissioner had not issued a binding order (or any order at all), had made no findings, and had reached no conclusions of liability or otherwise.  The clear purpose of First United's statements was to confuse and/or mislead FUNC shareholders as to the legitimacy of Driver's nominations, the process to be employed at the upcoming meeting, and whether proxies cast in favor of Driver would be counted.

143.   The effect of First United's false statements was that shareholders were unable to freely and fairly cast an informed vote on Driver's nominees.

144.   In reality, the Commissioner did not adopt the position of his staff referenced in the May 14 letter.  Instead, he declined to conclude that Driver had violated FI § 3-314 or any other statute, and he closed the investigation without making any findings at all, thereby terminating the administrative process and settling the matter once and for all.

145.   By Settlement Agreement and Consent Decree dated May 22, 2020 (the "Final Order")—two days following the filing of First United's complaint—the Commissioner closed his investigation with no findings of liability, stating: "nothing [in the final order] shall be construed

to mean, or to authorize any individual or business entity to assert, that the Commissioner has made any conclusive findings or determination that [Driver] violated FI § 3-314." Ex. A at ¶ 10.

146.    The Final Order expressly refuted the entire premise of First United's lawsuit.

147.    The Final Order establishes that it, not the May 14 letter, constitutes the agency's Final Order.  It states:

> NOW, THEREFORE, it is, by the Maryland Commissioner of Financial Regulation, hereby . . . ORDERED that this document shall constitute a Final Order of the Maryland Commissioner of Financial Regulation, and shall be enforceable as such . . . .

Ex. A at 9.

148.    The Final Order also made clear that, notwithstanding any views held by his staff, the Commissioner explicitly declined to make any conclusive findings or a determination that Driver violated FI § 3-314.  It states:  "[N]othing herein shall be construed to mean, or to authorize any individual or business entity to assert, that the Commissioner has made any conclusive findings or determination that either Respondents or Beneficiaries have violated FI § 3-314."  Ex. A ¶¶ 2, 4, 5, 10.

149.    The next business day (May 25, 2020), Driver publicly posted a copy of the Final Order and requested that First United dismiss the unfounded complaint.  The Commissioner also posted a copy of the Final Order on the official State website:  www.dllr.state.md.us/finance/consumers/enforcement.shtml.

150.    By then, First United had actual knowledge of the Final Order, confirmation from the State as to its authenticity and content, and express statements from the Commissioner refuting the factual predicate of First United's pending lawsuit.  But First United refused to dismiss the action.  To the contrary, First United issued a press release reaffirming the company's intent to pursue the lawsuit notwithstanding its knowledge that its allegations were false.  The decision to

maintain the lawsuit in the face of authoritative proof that its factual predicate was false was made by First United and the Incumbent Directors, in conjunction with counsel.

151.    The mere pendency of the lawsuit, meritorious or not, conferred tangible benefits on First United in that shareholders were misled, confused, and uncertain as to whether votes cast in support of Driver or its nominees would be given effect at the annual meeting.

152.    First United made the decision that the benefits it obtained from maintaining the frivolous lawsuit outweighed the importance of candor toward the tribunal or the shareholders whose votes would be cast only two weeks later.  Specifically, by persisting in a lawsuit to "resolve" an issue not in dispute, First United intended to falsely communicate to shareholders, and in fact communicated, that the Commissioner had made a finding that Driver violated FI § 3-314 and that court action was required to determine whether Driver's voting rights and its nominees would be recognized at the annual meeting scheduled for June 11, 2020.

153.    Under applicable rules, Driver's time to respond to the Garrett County complaint would not run until well after the June 11 annual meeting.  On July 31, 2020, Driver timely filed a motion to dismiss First United's state court action for lack of jurisdiction and failure to state a claim.  First United has not yet responded to that motion.

**VII.    First United's June 11, 2020 Annual Meeting.**

154.    On May 27, 2020, Driver again requested that First United confirm it will count Driver's votes at the annual meeting in light of the Commissioner's Final Order declining to find a violation of FI § 3-314 and the falsity of the predicate to the Garrett County action.

155.    On June 1, 2020, 10 days before the annual meeting, First United responded that it would conditionally recognize Driver's voting rights as a shareholder, but that it would retain the "right" to invalidate Driver's votes (and any votes cast for the candidates it nominated) pending the result of the Garrett County action.

156. The intent and the effect of First United's statement was to compound the uncertainty that shareholders' votes would be given effect. By stating that both Driver's votes and the votes of every shareholder cast in favor of Driver's nominees would be "conditional," and that their validity would be revisited only after a ruling in the Garrett County action, First United falsely communicated to shareholders that their votes might not count.

157. At the June 11 meeting, First United's Board nominated Defendants John F. Barr, Brian R. Boal, John W. McCullough, and Marisa A. Shockley. Driver nominated Michael J. Driscoll, Ethan C. Elzen, and Lisa Narrell-Mead.

158. The results of the election for board of directors were as follow:

|  | For | Withheld | Broker Non-Votes |
|---|---|---|---|
| John F. Barr | 3,863,192 | 127,452 | 73,067 |
| Brian R. Boal | 3,861,923 | 128,721 | 73,067 |
| John W. McCullough | 3,290,968 | 699,676 | 73,067 |
| Marisa A. Shockley | 5,113,543 | 244,606 | 73,067 |

|  | For | Withheld | Broker Non-Votes |
|---|---|---|---|
| Michael J. Driscoll | 1,347,034 | 20,471 | 0 |
| Ethan C. Elzen | 1,347,034 | 20,471 | 0 |
| Lisa Narrell-Mead | 1,347,034 | 20,471 | 0 |

159. Thus, First United's campaign was successful in its goal. The company, the Incumbent Directors, and their representatives had confused and misled shareholders, suppressed shareholder support for alternative voices, and reaped the benefits of a disenfranchisement campaign the primary purpose of which was to interfere with shareholders' ability to freely exercise their will as to who should represent them on the board of the company they own.

160. First United filed the election results with the SEC on June 17, 2020, noting that "these voting results are subject to recertification in the event that it is determined that Driver and its three director nominees were prohibited from voting their respective shares at the 2020 Annual

Meeting and/or that Driver was not entitled to make director nominations at the 2020 Annual Meeting." That filing compounded the misrepresentations, again falsely implying that the Commissioner's Final Order was something other than his final order, or that any legitimate issue remained for resolution by the Garrett County action.

161.    By persisting in the Garrett County action and making false public statements about its necessity, scope, and impact, the company and the Current Directors are making false and actionably misleading statements designed to further confuse shareholders about the ability of Driver to vote or nominate director candidates in any of the annual meetings for the next five years. The company and the Current Directors are actively attempting to usurp or suppress the ability of shareholders to elect directors of their choosing, and communicating to shareholders that any activity taken to criticize the Current Directors will be met with efforts to suppress those voices and disenfranchise those shareholders.

162.    This lawsuit now follows.

## CAUSES OF ACTION

### COUNT I – BREACH OF FIDUCIARY DUTY
### (Against All Individual Defendants)

163.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

164.    The Individual Defendants, as directors or officers of First United Corporation, owe and owed shareholders duties of obedience, care, loyalty, good faith and fair dealing, and disclosure. The Individual Defendants breached these fiduciary duties to Driver.

165.    The Individual Defendants each knowingly, recklessly, or negligently caused harm to Driver and other shareholders by acting in their own self-interest to retain their board seats.

166.    The Individual Defendants resisted the production of a list of its shareholders in response to two separate requests from Driver for the primary purpose of reducing the time Driver would otherwise have to wage a proxy contest.

167.    The Individual Defendants inappropriately thwarted shareholders' efforts to reform the board and corporate governance by disenfranchising the voting shares of Driver and other shareholders.

168.    The Individual Defendants interfered or attempted to interfere with Driver's shareholder rights to exercise and effect his voting stock by disenfranchising or canceling Driver's voting rights for up to five years.

169.    The Individual Defendants attempted to disenfranchise or cancel Driver's voting rights to nominate directors to the Board at the June 11, 2020 annual meeting by inappropriately instigating a government investigation in all of the ways and for the purposes stated previously.

170.    The Individual Defendants wasted corporate resources for the purpose of perpetuating themselves on the Board and obstructing Driver and other shareholders' exercise of their rights to undertake a proxy contest against the individual interests of management and the Directors.

171.    The Individual Defendants owed a fiduciary duty to shareholders including Driver to issue truthful and accurate press releases and public filings.  To discredit Driver and disenfranchise his voting shares, however, the Individual Defendants made false or misleading statements to shareholders, the SEC, and the Circuit Court of Maryland for Garrett County.

172.    First United's press releases and public filings are in violation of 17 C.F.R. § 240.14a(9), which prohibits the corporation from making any false or misleading statements

regarding a material fact by means of any proxy statement, form of proxy or other soliciting material filed with the SEC.

173.    The Individual Defendants failed to conduct an honest and fair election of First United's Board of Directors at the June 11, 2020 annual meeting.

174.    As a result of the Individual Defendants' breach of fiduciary duties, Driver has sustained damages and injuries in an amount to be determined at trial far in excess of the jurisdictional minimum, including but not limited to the diminished value of Driver's shares, the value of the voting and nomination rights impacted by Defendants' wrongful conduct, and other direct losses and actual costs and expenses incurred, among other damages.

175.    Furthermore, the Individual Defendants' wrongful actions were done maliciously, oppressively, and with intent to defraud.  Driver is therefore entitled to punitive and exemplary damages in an amount to be determined at trial.

### COUNT II – ABUSE OF PROCESS (Regulatory)
### (Against First United)

176.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

177.    Defendant First United's conduct amounts to an abuse of process under Maryland law because First United willfully instigated and caused the Office of the Commissioner of Financial Regulations to commence an administrative proceeding to accomplish a purpose not warranted—that is, to disenfranchise and cancel the voting rights of Driver for the purpose of protecting its Incumbent Directors' positions on the Board.

178.    Defendant First United lobbied and pressured the Commissioner to investigate Driver, under the guise of a violation of Maryland Financial Institution § 3-314(a), with the ulterior

purpose of disenfranchising and cancelling the voting rights of Driver and removing the ability of other shareholders to engage in free and fair elections of directors.

179.    Defendant First United willfully used and abused the regulatory process in its proxy contest to save its incumbent directors from losing their seats on the Board at the June 11, 2020 annual meeting.

180.    First United's intent was to use the regulatory process to strip away Driver's voting and nomination rights, and First United in fact diminished the value and effectiveness of those rights, both before and after the Commissioner closed the investigation and declined to find Driver in violation of FI § 3-314(a) or any other law.

181.    Defendant First United attempted to hide its role in the Commissioner's investigation by telling the Commissioner's staff "it is extremely important to FUNC that Driver not come away from that meeting [with OCFR] feeling that FUNC instigated your investigation."

182.    As a result of Defendant First United's wrongful instigation of a regulatory investigation and proceeding and repeated knowingly false assertions of a non-applicable regulatory/supervisory privilege, Plaintiff has been injured in its business and property, causing Plaintiff to suffer substantial monetary damages in an amount to be determined at trial.

## COUNT III – ABUSE OF PROCESS (Litigation)
### (Against First United)

183.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

184.    Defendant First United's conduct amounts to an abuse of process under Maryland law because First United willfully filed a declaratory action in state court to accomplish a purpose not warranted—that is, to disenfranchise and cancel the voting rights of Driver for the purpose of protecting its Incumbent Directors' positions on the Board.

185.     Defendant First United filed the state court action with the ulterior purpose of disenfranchising and cancelling the voting rights of Driver and removing the ability of other shareholders to engage in free and fair elections of directors, including by preventing Driver to nominate and vote at the June 11, 2020 annual meeting.

186.     In its state court complaint, First United falsely represented that "[i]t is undisputed that [Driver's] acquisition[] of shares of First United common stock constituted a 'stock acquisition' as defined by FI Article § 3-314(a)."  Ex. B, Compl. ¶ 17.

187.     Defendant First United falsely claimed that as of May 22, the Commissioner "has determined that [Driver's] stock acquisitions violated FI Article § 3-314."  *Id.*

188.     Even after the Commissioner concluded his investigation on May 24—finding no violation of FI §3-314—Defendant First United refused to withdraw its complaint.  Instead, First United continued to cast uncertainty into the election—that is, whether Driver's votes will ultimately be counted even after it nominates directors and votes on them.  In its June 17 filing with the SEC, First United disclaimed that the election results "are subject to recertification" pending the result of the state court action.

189.     Defendant First United willfully used and abused the litigation process in its proxy contest for the purpose of protecting its Incumbent Directors from losing their seats on the Board at the June 11, 2020 annual meeting, rather than for any legitimate interest in resolving a disputed legal issue.

190.     As a result of Defendant First United's wrongful commencement of a civil suit, Plaintiff has been injured in its business and property, causing Plaintiff to suffer substantial monetary damages, in an amount to be determined at trial.

## COUNT IV – MALICIOUS PROSECUTION (Litigation)
### (Against First United)

191.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

192.    Defendant First United commenced a civil action in the Circuit Court of Maryland for Garrett County while the state administrative proceeding was ongoing.

193.    The Commissioner has sole jurisdiction enforcing FI § 3-314.

194.    In an attempt to avail itself of the state court's jurisdiction, Defendant First United made false statements representing that the Commissioner conclusively determined that Driver violated FI § 3-314.

195.    Defendant First United wrongfully initiated and thereafter persisted in maintaining the state court action without probable cause, and with actual knowledge of the falsity of the allegations on which its claims relied.

196.    Defendant First United acted maliciously by filing the civil action to disenfranchise and cancel the voting rights of Driver and other shareholders, with the purpose of preventing Driver from nominating directors and voting at the June 11, 2020 annual meeting.

197.    Defendant First United falsely represented to shareholders and the SEC that the nature of the state court declaratory action is to "confirm . . . that Driver and its proposed candidates are prohibited from voting."  In so doing, Defendant First United intentionally misstated the status of the administrative proceeding and findings of the Commissioner.

198.    The action filed by First United in the Circuit Court of Maryland for Garrett County is so completely lacking in merit as to be the functional equivalent of a case already dismissed. Upon information and belief, First United will voluntarily dismiss or otherwise abandon the

unfounded claims in the Garrett County action before a response is due to the Complaint in this action.

199.    As a result of Defendant First United's malicious prosecution, Plaintiff has been injured in its business and property, causing Plaintiff to suffer substantial monetary damages, in an amount to be determined at trial.

## COUNT V – DEFAMATION (LIBEL)
### (Against First United)

200.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

201.    Defendant First United knowingly, recklessly, or negligently published false statements about Driver, including, *inter alia*, that "Driver was found to be in violation of Maryland law."

202.    Specifically, in the proxy contest, First United informed shareholders and the SEC that Driver violated Maryland FI § 3-314.

203.    Defendant First United further claimed that because Driver violated FI § 3-314, Driver cannot exercise its voting shares for five years.

204.    Defendant First United's statements about Driver are false: The Commissioner absolved Driver of any liability under FI § 3-314 and Driver in fact voted during the June 11 annual meeting.

205.    Defendant First United made the defamatory statements with actual malice—*i.e.*, with knowledge of their falsity, or, alternatively with a reckless disregard for their falsity.

206.    Defendant First United's statements convey a defamatory meaning—that is, it lowered the reputation of Driver in its profession, trade and/or business, which has a natural tendency to lessen its profits.

207.    As a result of the publication of false and defamatory statements, Driver has suffered damages, in an amount to be determined at trial.

208.    In making the defamatory statements, Defendant First United acted intentionally, maliciously, willfully and with the intent to injure Driver, or to benefit Defendants.  Defendant First United is liable to Driver for punitive damages in an amount to be determined at trial.

### COUNT VI – DEFAMATION (LIBEL) PER SE
### (Against First United)

209.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

210.    Defendant First United knowingly, recklessly, or negligently published false statements about Driver, including, *inter alia*, that "Driver was found to be in violation of Maryland law."

211.    Defendant First United falsely claimed that Driver engaged in illegal conduct and was held liable for violating FI § 3-314.  First United informed shareholders and the SEC that Driver violated FI § 3-314 during the proxy contest.

212.    Defendant First United further stated that because Driver violated FI § 3-314, Driver cannot exercise its voting shares for five years.

213.    Defendant First United's statements about Driver are false: The Commissioner absolved Driver of any liability under FI § 3-314 and Driver in fact voted during the June 11 annual meeting.

214.    Defendant First United made the defamatory statements with actual malice—*i.e.*, with knowledge of their falsity, or, alternatively with a reckless disregard for their falsity.

215.    Defendant First United's statements convey a defamatory meaning—that is, it lowered the reputation of Driver in its profession, trade and/or business, which has a natural tendency to lessen its profits.

216.    As a result of the publication of false and defamatory statements, Driver has suffered damages, in an amount to be determined at trial.

217.    In making the defamatory statements, Defendant First United acted intentionally, maliciously, willfully and with the intent to injure Driver, or to benefit Defendants.  Defendant First United is liable to Driver for punitive damages in an amount to be determined at trial.

## COUNT VII – TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS
### (Against All Defendants)

218.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

219.    By seeking to disenfranchise and cancel Driver's voting rights for five years, Defendants intentionally and willfully interfered with the economic relationship between Driver and its nominees to the Board of Directors, between Driver and other shareholders, and between Driver and potential buyers of First United.

220.    Defendants employed wrongful and malicious tactics to interfere with Driver's business relationships by filing proxy statements with false claims and abusing the regulatory and litigation processes.

221.    By attempting to disenfranchise and cancel Driver's voting rights, Defendants seek to interfere with Driver's ability to solicit and approve or disapprove of any potential sale of FUNC, as well as casting its vote on matters that require shareholder approval.

222.    As a result of Defendants' tortious interference, Driver has suffered damages in an amount to be determined at trial.

223.    In engaging in tortious conduct, Defendants acted intentionally, maliciously, willfully and with the intent to injure Driver, or to benefit Defendants.  Defendants are liable to Driver for punitive damages in an amount to be determined at trial.

**COUNT VIII – UNFAIR COMPETITION**
**(Against All Defendants)**

224.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

225.    Defendants has engaged in unfair competition by damaging or jeopardizing Driver's business by fraud, deceit, trickery or unfair methods.

226.    Defendants has engaged in unfair conduct by, *inter alia*, (1) violating 17 C.F.R. § 240.14a(9), which prohibits First United from making any false or misleading statements regarding a material fact by means of any proxy statement, form of proxy or other soliciting material filed with the SEC; (2) engaging in abuse of process by instigating an administrative proceeding against Driver for the ulterior motive of disenfranchising or cancelling Driver's voting rights; (3) engaging in abuse of process and malicious prosecution by filing an unwarranted declaratory action in the Circuit Court of Maryland in order to disenfranchise and cancel Driver's voting rights.  At all relevant times, Defendants made false statements about Driver and attempted to win the proxy contest through such fraud, deceit, trickery, and unfair method.

227.    As a result of Defendants' unfair competition, Driver has suffered damages in an amount to be determined at trial.

228.    In engaging in unfair competition, Defendants acted intentionally, maliciously, willfully and with the intent to injure Driver, or to benefit Defendants.  Defendants are liable to Driver for punitive damages in an amount to be determined at trial.

## COUNT IX – UNJUST ENRICHMENT
### (Against All Individual Defendants)

229.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

230.    By their wrongful acts, Defendants were unjustly enriched at the expense, and to the detriment, of Driver and other shareholders.

231.    The Individual Defendants were unjustly enriched as a result of compensation and benefits as directors or officers of First United while breaching their fiduciary duties owed to the shareholders.

232.    Plaintiff seeks restitution or disgorgement from the Individual Defendants of all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against all Defendants, jointly and severally, as follows:

A.    Finding Defendants liable for all damage caused to Plaintiff;

B.    Awarding Plaintiff monetary damages in an amount to be proven at trial;

C.    Awarding Plaintiff punitive damages in an amount to be proven at trial;

D.    Vacating the results of First United's June 11, 2020 election for board of directors and ordering a new election;

E.    Granting such other relief as the case may require or as this Court deems proper and equitable.

## JURY DEMANDED

Plaintiff demands a trial by jury on all triable issues.

Respectfully submitted,

Dated: September 4, 2020          MORGAN, LEWIS & BOCKIUS LLP

By:   *s/ Jason R. Scherr*
    Jason R. Scherr

1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:   +1.202.739.3000
Facsimile:    +1.202.739.3001
Email:         jr.scherr@morganlewis.com

*Counsel for Defendant Driver Opportunity
   Partners I LP*